Receipt number AUSFCC-11307030

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

|  |  |  |
|---|---|---|
| WASHINGTON NATIONAL OPERA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | **26-864 C** |
| v. | ) | Case No. _____ |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**<u>COMPLAINT</u>**

Plaintiff the Washington National Opera ("WNO"), by and through its undersigned counsel, brings this action against Defendant the United States, acting through the John F. Kennedy Center for the Performing Arts (the "Kennedy Center"). In support, WNO alleges as follows:

**INTRODUCTION**

1. WNO reluctantly files this case to preserve its future and to protect its donors and artists. After the termination of a long-standing relationship between WNO and the Kennedy Center, the Kennedy Center has refused to return over $17 million that belongs to WNO. These funds are critical to WNO's operations and represent years of gifts and donations that WNO's supporters made for its benefit.

2. For approximately 15 years, WNO and the Kennedy Center had a contractual relationship under which WNO produced its world-class operas at the Kennedy Center, and the Kennedy Center provided a number of services and other support for WNO, including managing—for the benefit of WNO—donations made to WNO. During this affiliation, WNO and the Kennedy Center always remained separate legal entities. And at all times, the WNO funds being managed by the Kennedy Center for WNO belonged to WNO, not the Kennedy Center.

3.     By the second half of 2025, the Kennedy Center stopped performing many of its obligations under the governing affiliation agreement, including marketing, fundraising, and administrative support, as well as timely reporting on the growth of WNO's funds. Despite repeated requests from WNO, the Kennedy Center did not remedy its non-performance. Instead, it proposed that the parties end their long-standing affiliation. That affiliation came to an end in January 2026.

4.     When the affiliation ended, WNO immediately requested that the Kennedy Center return the more than $17 million in WNO funds that the Kennedy Center had managed for WNO. The affiliation agreement is clear that the funds belong to WNO and that the Kennedy Center is required to return them. Yet, five months have now passed since the termination of the affiliation, and the Kennedy Center still has not returned the funds to WNO. To the contrary, according to the Kennedy Center's Chief Financial Officer, the Kennedy Center has put a significant portion of WNO's money at risk by using it to collateralize the Kennedy Center's line of credit.

5.     The funds held by the Kennedy Center represent years of gifts and contributions made by loyal WNO donors who specifically directed their support to benefit WNO and its mission. Those donors trusted that their contributions would support WNO's artists, its performances, and the education and community programs that WNO has carried out for decades.

6.     Over the past five months, WNO has diligently sought to resolve this matter short of litigation. It has provided the Kennedy Center with its own estimate of the funds to be returned, proposed numerous meetings with the Kennedy Center, and, when meetings proved unproductive, requested—consistent with the operative agreement—that the Kennedy Center participate in mediation. However, the Kennedy Center has not returned WNO's money and has not agreed to participate in mediation.

7.    Having exhausted its efforts to amicably resolve this matter, WNO files this lawsuit to seek the return of money that belongs to it and is necessary to fulfill its mission.

## JURISDICTION

8.    This Court has subject-matter jurisdiction over this action under the Tucker Act, 28 U.S.C. § 1491(a)(1), because WNO seeks monetary relief against the United States based on an express contract with a federal instrumentality in a case not sounding in tort.

9.    This action is timely under 28 U.S.C. § 2501 because WNO's claims accrued within six years of the filing of this Complaint.

10.    This Court is the proper forum for this action because claims under 28 U.S.C. § 1491(a)(1) seeking more than $10,000 fall within the jurisdiction of the United States Court of Federal Claims.

## PARTIES

11.    Plaintiff the Washington National Opera is a nonprofit corporation organized under the laws of the District of Columbia and based in Washington, D.C. Since 1956, WNO has been dedicated to presenting high-quality opera performances and artistic, educational, and community engagement programming.

12.    Defendant is the United States of America, acting through the John F. Kennedy Center for the Performing Arts, a federally chartered entity established by an Act of Congress and operating as a bureau of the Smithsonian Institution. 20 U.S.C. §§ 76h(a)(1); 76k(a). Authorized by bipartisan legislation in 1958 and redesignated in 1964 as a living memorial to President John F. Kennedy, *see* Pub. L. No. 88-260, 78 Stat. 4 (1964), the Kennedy Center serves as the United States' national cultural center for the performing arts.

**FACTUAL ALLEGATIONS**

**A.      WNO's Mission, Operations, and Funding**

13.      WNO is a nonprofit opera company based in Washington, D.C., dedicated to producing and presenting opera at the highest artistic level. Founded in 1956, WNO has grown into one of the leading opera companies in the United States and is a cornerstone of the District's performing arts community. WNO presents a wide range of programming, including fully staged productions of canonical operas, new and contemporary works, and special performances and concerts.

14.      WNO also serves a broad civic and cultural role, reaching diverse audiences through educational initiatives for schoolchildren, free community events such as Opera in the Outfield, and other public programming. WNO also engages and supports a large community of artists, musicians, and backstage professionals, many of whom work with WNO on a project or contractual basis, and fosters emerging talent through initiatives like the Cafritz Young Artists Program.

15.      Opera production is a complex logistical undertaking. It requires coordinating with an orchestra and numerous artists—including singers, conductors, musicians, and directors—as well as technical and production personnel responsible for staging, costumes, lighting, and set design, and depends on administrative staff to plan, execute, market, and fund each production. WNO typically plans its productions two to four years in advance to secure talent and production resources and to maintain its high artistic standards.

16.      Like other nonprofit arts organizations, WNO's work is funded primarily through voluntary donations made by members of the public, as well as sponsorships, grants, and other philanthropic support, as ticket sales cover only a fraction of production costs and do not provide the financial stability needed for multi-year planning.

17.     WNO has historically benefitted from the generosity of a broad and deeply committed community of donors—individuals, foundations, estates and the like—whose contributions range from $5 to substantial gifts and significant bequests to support WNO's artistic mission. Big or small, all gifts reflect and depend on donors' goodwill and confidence in WNO's fiscal stewardship.

18.     Philanthropic support for WNO comes in many forms, including annual gifts, grants, and bequests. Some of those gifts are made for general operating support, while others are designated for particular purposes, including productions, education and community programming, artist development, innovation initiatives, and long-term endowment support.

19.     These contributions are essential not only to WNO's productions, but also to WNO's broader mission, including education programs, free public events, and the long-range commitments required to engage artists, support musicians and production personnel, and plan opera seasons years in advance.

### B.     The Affiliation Between WNO and the Kennedy Center

20.     WNO has regularly held performances at the Kennedy Center since the Center's opening in 1971, and the two institutions long maintained a close relationship.

21.     In 2011, WNO and the Kennedy Center agreed to formally affiliate to strengthen WNO's artistic and financial foundation and to allow the Kennedy Center to offer outstanding opera performances as part of its artistic programming.  WNO and the Kennedy Center thus entered into an affiliation agreement in 2011 (the "2011 Agreement"). WNO continued to exist as a separate nonprofit corporation with its own mission and Board of Trustees throughout the affiliation. The affiliation was intended to achieve operational efficiencies, strengthen fundraising capabilities, and enhance the artistic potential and public outreach of both organizations.

22.     Under that initial framework, the Kennedy Center "assumed responsibility for managing, administering, and funding" WNO's operations, *see* 2011 Agreement § 5(p), and undertook to maintain WNO's assets, records, donor information, financial accounts, and funds raised or held for WNO's benefit.

23.     In 2024, WNO and the Kennedy Center entered into a new affiliation agreement (the "2024 Agreement," attached as **Exhibit A**) to continue and refine the parties' longstanding relationship. The 2024 Agreement would "provide the appropriate scaffolding to continue to support and advance their mutual goals and objectives"—including by memorializing certain understandings and practices that had developed to ensure they continued into the future—and allow the parties "to offer outstanding opera performances and related activities as part of their artistic programming."

24.     The 2024 Agreement expressly "terminate[d]" the 2011 Agreement and preserved only certain Kennedy Center contractual obligations then in effect, such as undertakings relating to current or future seasons. §§ 12.3, 14.7. The Agreement also "supersedes" all prior agreements and understandings, while preserving "operational and working practices" to the extent not inconsistent with the 2024 Agreement. § 14.7.

25.     Under the 2024 Agreement, the Kennedy Center again agreed to manage, administer, and carry out WNO's operations by providing a range of services to WNO, including operational and administrative support (including WNO's production and artistic functions) and financial support. *See* §§ 2.1–2.4, 2.7–2.8, 3.1–3.5, 7.5, 8.1–8.2; Annexes A–B.

26.     For example, the Kennedy Center agreed to employ staff—though paid for by WNO's budget—dedicated to WNO's operations, including artistic and music staff, technical and production staff, and staff supporting financial management, governance, constituent relations,

community engagement, and administration. §§ 2.1–2.2. It also agreed to provide additional support for WNO's development, marketing, and public relations activities (§ 2.3; Annex A), recognizing that "fundraising activities for the benefit of WNO" were "critical to ensuring WNO's vitality and long-term sustainability." § 6.1. The Kennedy Center further agreed to continue providing comprehensive IT system services, maintaining WNO's hardware, software, and email records. Annex B.

27.    The 2024 Agreement did not leave the level of Kennedy Center support to the Kennedy Center's unfettered discretion. Instead, the Kennedy Center agreed to dedicate sufficient resources, "within the construct of its own capacity and resources," to perform the functions and employ the personnel set out in the Agreement "in a manner appropriate for a leading opera company" and generally in accordance with commercially reasonable management practices. § 2.1. The Kennedy Center also agreed to provide its services to WNO at a quality substantially similar to that provided to WNO as of the Agreement's effective date. § 2.6.

28.    WNO, in turn, supplied the artistic and philanthropic substance at the core of the affiliation. It recruited and presented world-class singers, conductors, and directors; staged full seasons of opera in the Kennedy Center's venues; and sustained the donor relationships it had built over decades. WNO's artistic reputation, leadership, and donor base fueled contributions credited to the WNO Financial Accounts described below.

**C.    Treatment of the WNO Financial Accounts in the 2024 Agreement**

29.    In the 2024 Agreement, the parties also revised and clarified the contractual terms governing how funds are raised and maintained for the benefit of WNO. *See* Art. VI. Among other things, the Kennedy Center agreed to "collect funds stated by donors to benefit WNO" and to account for and credit those funds "solely to the WNO Financial Accounts," § 6.2—accounts maintained by the Kennedy Center that record all financial activities attributable to WNO, § 7.1.

30.     The WNO Financial Accounts include the following:

i.      *WNO Endowment Fund*. This fund consists of gifts, bequests, and contributions "exclusively and permanently restricted by WNO Donors for endowment uses by WNO or WNO Inc." § 6.3(a). The 2024 Agreement required the Kennedy Center to "credit[]" all generated earnings and profits to that fund. § 6.3(c). Further, WNO was entitled to an annual distribution from the WNO Endowment Fund, determined by the Kennedy Center in accordance with the Kennedy Center's endowment spending guidelines. § 6.3(d).

ii.     *WNO Board Special Revenue Fund ("WNO BSRF")*. This fund consists of unrestricted bequests received for WNO's benefit and other WNO-designated contributions. These funds were "unrestricted" for accounting purposes because the donors had not restricted them for WNO endowment use. Before the 2024 Agreement, the Kennedy Center had been accounting for these unrestricted bequests and contributions in another account. The 2024 Agreement called for the creation of the WNO BSRF and required the Kennedy Center to transfer into it the unrestricted bequests and donations it had been holding for WNO's benefit in another account. § 6.4(b). In early 2025, the Kennedy Center reported to WNO that it had transferred over $7.7 million of those funds into the WNO BSRF, as required. Whether held in the WNO BSRF or otherwise maintained by the Kennedy Center on WNO's behalf, those funds are held "for the long-term benefit of WNO," and

distributions from the fund were reflected in WNO's Financial Accounts and used to support WNO's operations. § 6.5(a), (c).

iii. *WNO Fund for Innovation and Excellence ("FFIE")*. This is an unrestricted discretionary fund established by the WNO Board to support WNO's operations and initiatives. § 6.6(a). In the 2024 Agreement, the Kennedy Center agreed to maintain the FFIE as a segregated fund that could receive designated contributions and other amounts approved by the WNO Board. § 6.6(a)–(b). Withdrawals from the FFIE were reflected in WNO's annual budget and used in accordance with WNO Board-approved guidelines. § 6.6(c).

31. The 2024 Agreement required that all amounts in the foregoing WNO Financial Accounts be "used exclusively . . . for the benefit of WNO," and the Kennedy Center could "not subsidize non-WNO operations" using those amounts. § 8.3.

32. The 2024 Agreement also required the Kennedy Center to record all financial activities in the WNO Financial Accounts, including all earned and contributed revenues, endowment distributions, and withdrawals from WNO's funds. §§ 7.1–7.2. It also required the Kennedy Center to provide WNO with periodic financial reports and, upon request, detailed information regarding the balances of and entries within those accounts, including information relating to the Endowment Fund, the WNO BSRF, and the FFIE. §§ 8.4, 9.4. In practice, the Kennedy Center typically provided annual audited financial statements for the year closing in September in January or February the following year. Unaudited financial statements were generally available on a 30-to-60 day basis.

33.    The 2024 Agreement addressed expenses incurred by the Kennedy Center in connection with WNO and its programs in two ways. First, the Agreement provided that WNO would effectively pay back the Kennedy Center for certain defined "Direct Expenses" incurred by the Kennedy Center and attributable to the operation of WNO and WNO programs, such as compensation for the dedicated WNO staff the Kennedy Center employed (the "WNO Programmatic Staff," § 2.2), artist compensation, expenses associated with the WNO Orchestra, and costs associated with WNO's seasonal productions and programs. §§ 7.3. Under the 2024 Agreement, these Direct Expenses were covered through a combination of WNO's revenues and other support, with the annual distribution from the WNO BSRF dedicated solely to offsetting them. *See* §§ 6.5(c), 7.2.

34.    Second, the 2024 Agreement provided that WNO was *not* required to pay back the Kennedy Center for other expenses incurred by the Kennedy Center in connection with WNO and its programming. In particular, the Agreement contemplated that the Kennedy Center would incur certain indirect expenses—referred to as "internal charges" and "allocated expenses"—in connection with providing services attributable to WNO and its programming. § 7.4(a), (b). These "internal charges and allocated expenses" included theater license fees (also known as theater rent), ticketing commissions, and certain fundraising and development-related costs associated with WNO. § 7.4(a)–(b). While the Agreement stated that these charges and expenses would be recorded to the WNO Financial Accounts (*id.*), the Agreement also stated that all such charges and expenses would be "credited back on the WNO Financial Accounts…such that WNO receives those services and other items from the Kennedy Center ***on a cost-free basis***." § 7.5 (emphasis added).

35.     This credited-back-costs provision reflected the parties' longstanding agreement and practice, pre-dating the 2024 Agreement, that the Kennedy Center would provide services to WNO without ultimately charging WNO for the Kennedy Center's indirect expenses. Indeed, during the term of the 2011 Agreement, when the Kennedy Center recorded certain internal charges to WNO—including, for example, Theater License Fees—it also recorded corresponding offsets or internal transfers that credited those charges back. Moreover, during the entire term of the 2011 Agreement, the Kennedy Center did not allocate to WNO similar indirect expenses of the Kennedy Center, including any general and administrative, institutional affairs, development, or operations and maintenance expenses.

36.     In addition, the 2024 Agreement required the Kennedy Center to make a fixed annual contribution of $2.75 million to WNO (the "Kennedy Center Contribution"), a core component of WNO's annual budget. *See* § 8.1. The Kennedy Center Contribution was unconditional operating support for WNO and was not a loan, advance, or otherwise recoverable expense.

37.     Finally, in the event of termination of the 2024 Agreement, Section 12.2 required that all "WNO Assets"—including funds, endowments, donor records, financial records, and all "other assets" transferred to, acquired by, or otherwise maintained on WNO's behalf since 2011— "shall be delivered to WNO Inc., as of, or promptly after," the termination date. The Kennedy Center's contractual obligation to return WNO's assets survived the 2024 Agreement's termination. § 12.2.

**D.      The Kennedy Center's Support for WNO Deteriorates in 2025**

38.     In or around March 2025, the parties' relationship began to deteriorate. Despite repeated requests, the Kennedy Center reduced—or failed to provide altogether—key staffing and

support functions contemplated by the 2024 Agreement—that is, resources and personnel commensurate with those needed to manage "a leading opera company." § 2.1.

39. The situation was especially dire in development, which is WNO's largest revenue source and critical to its financial stability. The 2024 Agreement acknowledged as much by requiring the Kennedy Center to maintain an eight-position WNO Development Office, to be expanded to twelve positions over time. *See* Exhibit B to 2024 Agreement. By November 2025, however, the WNO Development Office had no full-time development staff. Contracts for interim staffing, prepared and submitted by WNO, remained unexecuted by the Kennedy Center leadership, and WNO's repeated requests for posting full-time positions went ignored. Similar vacancies affected marketing, public relations, education, management of the orchestra, and artistic operations. Because the 2024 Agreement required all WNO staff to be hired and employed by the Kennedy Center through its own HR processes, WNO had no independent authority to fill these positions itself. *See* § 2.2. The resulting shortages hampered WNO's ability to raise funds and market its performances.

40. The result was chaos. Gifts went unprocessed or unacknowledged, donor benefits went unfulfilled, and donor communications went unanswered. WNO staff had to perform work the Kennedy Center had agreed to provide, trying to protect donor relationships and to preserve WNO's fundraising pipeline. WNO employees performed multiple job functions at once and worked extended hours to maintain basic operations.

41. WNO also lost all visibility into its own financial activities by fall 2025, when the Kennedy Center implemented new financial-management software. Under the prior system, WNO staff had direct visibility into most of the WNO Financial Accounts. After the transition, WNO could no longer see posted revenues, expenses, contributions, fund balances, and other entries.

WNO repeatedly requested that the Kennedy Center restore that access, but it never did, forcing WNO to create and maintain its own spreadsheets and attempt to reconstruct its own finances.

42.    At the same time, the Kennedy Center's financial reporting became delayed, incomplete, and largely inaccessible. For months, and despite repeated requests, the Kennedy Center failed to provide the regular financial reports and fund-balance information required by the 2024 Agreement, forcing WNO to operate on stale and incomplete information last provided in March 2025. As a result, WNO could not reliably track new donor gifts received by the Kennedy Center on WNO's behalf or confirm that such contributions were properly credited to the WNO Financial Accounts.

43.    On top of that, the Kennedy Center pressured WNO to meet a new "net-neutral requirement," under which WNO productions could not proceed unless fully funded in advance through projected ticket sales and confirmed sponsorships. That was a fundamental shift from the framework reflected in the 2024 Agreement, which contemplated that WNO's annual budget would be balanced through a combination of earned revenue, philanthropic contributions, endowment distributions, and the Kennedy Center's annual contributions—not on a production-by-production basis. Because opera productions are planned years in advance and funded over time, the Kennedy Center's new business model was incompatible with WNO's operations—and indeed, with the operations of any major American opera company—and significantly constrained its ability to plan future productions.

44.    For months, WNO repeatedly tried to address these issues with the Kennedy Center, including through written requests, requests for meetings, and meetings with Kennedy Center leadership. Those efforts were met with indifference. Meetings were delayed or canceled. Rather than provide the staffing, services, financial visibility, and support required by the 2024

Agreement, the Kennedy Center allowed the operational crisis to worsen. Further, the Kennedy Center began attempting to interfere with WNO's artistic programming.

45.    By fall 2025, the Kennedy Center's conduct made clear that it did not intend to perform its obligations under the 2024 Agreement.

**E.    The Parties Terminate the Agreement at the Kennedy Center's Suggestion and Begin Unwinding the Affiliation**

46.    Ever since problems with the Kennedy Center's performance under the 2024 Agreement arose in early 2025, WNO has actively attempted to resolve the issues with the Kennedy Center to no avail.

47.    On November 8, 2025, the Kennedy Center's then-President Richard Grenell asked whether WNO would be open to an early amicable termination of the 2024 Agreement. Given the Kennedy Center's ongoing failure to perform its contractual obligations and its apparent unwillingness to engage with WNO on those issues, WNO took Mr. Grenell's proposal seriously as a potential—indeed, the only—path to preserve WNO's operations and protect its mission. WNO therefore communicated to the Kennedy Center its willingness to explore an amicable termination. The Kennedy Center never disavowed its proposal, never stated that it intended to perform its obligations under the 2024 Agreement, and never took any steps to address the operational failures WNO had repeatedly identified. To the contrary, in December 2025, the Kennedy Center required WNO, as a condition of executing a WNO warehouse lease, to agree that it would assume responsibility for the lease if the 2024 Agreement ended.

48.    WNO's Board President reached out to the Kennedy Center's President on multiple occasions to advance discussions of an amicable termination, but the Kennedy Center's responses consistently deflected from the substance of those discussions and never resulted in any meaningful progress toward resolution.

49.    On January 8, the Kennedy Center's Chief Financial Officer sent an email to WNO's General Director and Board President asserting for the first time and, contrary to the terms of the 2024 Agreement, that the funds in the WNO BSRF belonged to the Kennedy Center. In addition, the CFO disclosed that the Kennedy Center had used those funds—funds that the 2024 Agreement expressly required to be held for the long-term benefit of WNO—to collateralize the Kennedy Center's *own* line of credit.

50.    The next day, on January 9, 2026, the WNO Board voted to terminate the 2024 Agreement. WNO's Board President and Board Chair immediately notified the Kennedy Center of that decision in a letter to Mr. Grenell and requested that the parties begin unwinding the affiliation.

51.    In that letter, WNO requested that the Kennedy Center return all WNO Assets by no later than March 31, 2026, following a prompt good-faith accounting and reconciliation of any WNO Direct Expenses not yet offset by revenues from WNO activities in the WNO Financial Accounts, as defined by the 2024 Agreement. WNO also requested a complete accounting of its financial assets in accordance with the 2024 Agreement.

52.    Later that day, the Kennedy Center cut off WNO's access to its electronic data stored on the Kennedy Center's systems, including WNO's emails, donor information, meeting minutes, and Board of Trustees records dating back to 2011. The Kennedy Center also locked WNO out of its workplace locations and, soon after, sent termination letters to WNO employees. And it removed all mention of WNO from the Kennedy Center's website; pages for all performances remaining in the WNO season vanished.

53.    On January 9 (and reposted on January 10), Mr. Grenell stated on X/Twitter that "[t]he Trump Kennedy Center has made the decision to end the EXCLUSIVE partnership with the

Washington Opera." https://perma.cc/M673-GE79. The Center's spokesperson Roma Daravi likewise told the New York Times that the Kennedy Center had "decid[ed] to part ways with WNO."

54.     On January 13, the Kennedy Center responded by letter, stating it had decided "to end the exclusive partnership with the WNO" and, consistent with the parties' understanding that the affiliation was being terminated and unwound, directed WNO to take a series of "immediate[]" steps in connection with the separation. Among other things, it directed WNO to return all Kennedy "Center property in the possession of WNO employees," including computers, cell phones, and badges; to arrange for the return of sets and equipment stored on WNO premises; and to "cease" using Kennedy Center "confidential and proprietary information." The Kennedy Center's letter did not address WNO's request for the return of its financial assets and records or its request for an accounting.

55.     WNO, for its part, promptly worked to address the Kennedy Center's requests, including by returning equipment, coordinating the transfer of property, and proposing practical solutions to facilitate an orderly transition. On January 16, WNO replied by proposing a collaborative process to resolve outstanding issues, including the transfer of assets, data, contracts, and financial accounts in accordance with the 2024 Agreement. WNO again requested that the Kennedy Center provide a complete accounting of WNO's financial assets and return those assets promptly following reconciliation.

56.     WNO continued to cooperate in good faith with the Kennedy Center to unwind the affiliation throughout the following months. For example, WNO began paying rent directly to landlords on real property leases that remained in the Kennedy Center's name pending assignment of those leases to WNO.  WNO also agreed to reimburse the Kennedy Center for WNO's share of

healthcare premiums associated with orchestra musicians who perform for both WNO and the Kennedy Center. Eventually, the parties also coordinated the transfer of certain physical property, data, and records consistent with Article XII's termination provision. Yet, several requests to the Kennedy Center for the return of WNO data and physical property still remain outstanding.

### F.   The Kennedy Center Does Not Return WNO's Financial Assets or Provide an Accounting Consistent with the 2024 Agreement

57.   However, despite repeated requests made in the course of meetings, calls, and emails over the following weeks and months, the Kennedy Center did not return any of the funds in the WNO Financial Accounts and did not provide a complete accounting in accordance with the 2024 Agreement.

58.   Based on financial information previously provided by the Kennedy Center and WNO's internal records, and after accounting for WNO Direct Expenses not yet offset by WNO revenues and other support according to the terms of the 2024 Agreement, WNO estimates that the Kennedy Center is withholding at least $17,101,186 in WNO financial assets. Those include funds held in or attributable to the WNO Endowment, the WNO BSRF, the FFIE, and other earned and contributed income that the Kennedy Center collected or maintained for WNO's benefit.

59.   In the months since the January 9 termination—which the Kennedy Center's Board of Trustees unanimously confirmed on March 16 by resolution authorizing its Chief Financial Officer and General Counsel to negotiate the terms of the disaffiliation on behalf of the Center—the Kennedy Center has not returned any of WNO's financial assets, has refused to state whether it intends to return any of those assets, and has not provided an accounting consistent with the 2024 Agreement.

60.   Multiple provisions of the 2024 Agreement make clear that the WNO financial assets being managed by the Kennedy Center belong to WNO and not the Kennedy Center. For

example, Section 6.2 provides that "The Kennedy Center agrees to collect funds stated by donors to benefit WNO ("WNO Donors") and will account for such funds and credit such funds solely to the WNO Financial Accounts." Likewise, Section 6.3 provides that "All earnings and profits that derive from the Washington National Opera Endowment Fund shall be credited to the Washington National Opera Endowment Fund." In addition, Section 6.5(a) states that "Funds held in the WNO Board Special Revenue Fund will be held by the Kennedy Center for the long-term benefit of WNO as approved by the WNO Board and in accordance with Section 7.2(b)(i)." Still further, Section 8.3 provides: "Amounts recorded to the WNO Financial Accounts pursuant to Section 7.2 shall be used exclusively (other than as described in Section 2.2 with regard to the incidental provision of support by WNO Programmatic Staff to the Kennedy Center for its other activities and programs) for the benefit of WNO and the Kennedy Center shall not subsidize non-WNO operations of the Kennedy Center out of such amounts."

61.     Consistent with the multiple provisions in the 2024 Agreement setting forth that the WNO financial assets belong to WNO and not the Kennedy Center, Section 12.2 of the 2024 Agreement expressly requires the Kennedy Center to return WNO's financial assets upon termination.

## G.    The Kennedy Center's Conduct Has Caused Significant Disruption to WNO's Operations and Programmatic Planning

62.     The Kennedy Center's actions have caused, and continue to cause, significant disruption to WNO's operations. The loss of access to WNO's financial accounts, data, and records has interfered with WNO's ability to carry out core operational functions, including tracking revenues and expenses, managing donor relations, and maintaining accurate financial records. WNO has been forced to reconstruct its financial position using internal spreadsheets and

incomplete data and to operate without historical data that ordinarily informs donor stewardship, subscription campaigns, ticket sales, budgeting, and season planning.

63.    And the lack of access to donor records and development systems has materially impaired WNO's fundraising operations. In 2025, while the Kennedy Center controlled WNO's gift-processing, acknowledgment, and development operations, Kennedy Center staffing shortages and failures caused donor gifts to go unprocessed and donor acknowledgments to be delayed or not sent at all. WNO was unable to confirm whether contributions intended for WNO were received or properly credited, undermining ongoing fundraising efforts and relationships with donors.

64.    With the status of WNO's funds in limbo, donors have also been confused as to the proper destination of funds intended for WNO after termination. For instance, last year a court resolved an ambiguity in one donor's estate documents, which contained an apparent misnomer as to the intended beneficiary, by determining that the donor intended her substantial gift—approximately $300,000—to benefit WNO. However, the court directed that the funds be paid to the Kennedy Center for the benefit of WNO. When news broke that WNO and the Kennedy Center would part ways, the estate inquired whether the Kennedy Center should still receive the bequest. Even after the parties terminated the 2024 Agreement and their separation became public, the Kennedy Center insisted that the funds should be sent to it, not to WNO. And later, when WNO demanded return of the $300,000 gift, the Kennedy Center refused and instead proposed that it be split in half with WNO, after deducting the Kennedy Center's legal fees from the gift. This is emblematic of the Kennedy Center's willingness to disregard donors' intentions and attempt to keep for itself funds that were plainly intended for and belong to WNO. These events have sown

confusion among donors and threaten to delay or divert contributions intended for WNO unless WNO regains control over its funds.

65.    The withholding of WNO's financial assets has had immediate financial consequences. WNO's FY 2026 budget was developed and approved by the Kennedy Center based on the expectation that WNO would receive annual distributions from its endowment and other funds, including about $850,000 in draws. But WNO still has not received those distributions for fiscal year 2026. Without access to those funds, WNO has been forced to rely on reserve funds and emergency fundraising to meet its existing obligations to artists, venues, staff, and vendors. WNO's budget for the 2026–2027 season likewise anticipates that those draws will again be unavailable, curtailing WNO's programmatic capabilities for that season while donor funds intended to support WNO remain stranded at the Kennedy Center and unavailable for their intended purpose.

66.    Drawing on reserve funds and advancing donor commitments reduces WNO's financial flexibility and undermines its ability to sustain operations in future years, including by limiting its ability to plan and execute future seasons.

67.    The Kennedy Center's conduct has also impaired WNO's ability to engage in long-term programmatic planning. Without access to its funds and reliable financial data, WNO has been unable to confidently plan future seasons and may be forced to reduce the number of performances in upcoming seasons, including the 2026–2027 season.

68.    The Kennedy Center's failure to provide agreed-upon services—including staffing, marketing, and development support—has compounded WNO's financial challenges. From March 2025 through January 2026, key positions in fundraising, marketing, and public relations remained vacant for months, so WNO was without the personnel necessary to maintain donor relationships,

execute marketing plans, and generate ticket sales. WNO experienced significant declines in ticket sales and fundraising, and the resulting disruption contributed to the financial and operational instability that WNO has had to manage during the post-termination period.

69. These operational and financial disruptions have also had cascading effects on WNO's workforce. Since 2025, WNO employees had to perform multiple roles simultaneously because key functions remained understaffed or vacant.

70. The Kennedy Center's conduct also affects the broader civic community WNO serves. WNO's inability to access its funds and data has already forced WNO to scale back its educational initiatives and puts at risk its free public performances and outreach programs, affecting thousands of audience members, students, and community participants.

71. Finally, the Kennedy Center's conduct threatens lasting reputational and institutional harm to WNO. Before the disaffiliation in January 2026, the Kennedy Center controlled WNO's gift-processing operations, and its inadequate staffing and administrative lapses damaged donor trust. For example, one donor's intended $50,000 credit-card contribution was never processed by the Kennedy Center's staff responsible for such gift processing. Expecting a substantial charitable gift to be handled promptly and professionally, the donor withdrew the gift, and WNO lost both the contribution and the valuable donor relationship. After the January 2026 separation, the strain on donor trust took a different form. WNO can now process and acknowledge new gifts made directly to WNO, but donors have raised questions about whether past contributions and bequests entrusted to the Kennedy Center for WNO will continue to support WNO's mission. WNO's ability to raise future funds hinges on its ability to assure donors that funds given for WNO will be honored, protected, and used for WNO's benefit. The Kennedy

Center's refusal to return those funds, and WNO's inability to account for and steward donor contributions, therefore threatens donor confidence and, with it, WNO's lifeline.

**H.     WNO Repeatedly Sought to Resolve the Dispute, But the Kennedy Center Still Has Not Returned WNO's Funds**

72.    Despite WNO's repeated good-faith efforts to recover its financial assets and obtain the accounting required by the 2024 Agreement, the Kennedy Center has not returned the money.

73.    In their January 9, 2026 letter informing the Kennedy Center that WNO was terminating the 2024 Agreement in accordance with Mr. Grenell's suggestion, WNO's Board President and Board Chair requested that the Kennedy Center perform a full accounting in accordance with the 2024 Agreement and return WNO assets, including its money, by March 31, 2026.

74.    When the Kennedy Center responded to WNO's January 9 letter, it did not even address the accounting or the many millions of dollars of WNO funds held by the Kennedy Center. WNO followed up with the Kennedy Center multiple times to request a meeting to address its financial assets.

75.    On January 26, WNO met with the Kennedy Center's General Counsel, Elliot Berke, and Chief Financial Officer, Donna Arduin. That meeting addressed disaffiliation issues other than WNO's financial assets. Shortly after that meeting, WNO requested a follow-up meeting focused specifically on those assets, along with the financial data needed to make the meeting productive. The Kennedy Center agreed to meet again on February 3 but ignored WNO's request for financial data.

76.    On January 29, WNO also requested a meeting with Matt Floca—the Kennedy Center's Vice President of Facilities Operations, who has since become its COO and Executive Director—and separately asked Ms. Arduin for specific financial data originally requested on

January 27, including FY2026 actuals and current balances for the WNO Endowment and the WNO BSRF. The Kennedy Center did not respond to either request.

77.     Ahead of the February 3 meeting, WNO again requested financial data to facilitate discussions. When the Kennedy Center provided none, WNO shared its own good-faith accounting of WNO's financial assets, prepared in accordance with the procedures and defined terms of the 2024 Agreement, to move the resolution process forward and provide a concrete basis for discussion.

78.     But at the February 3 meeting—attended by Ms. Arduin, Mr. Berke, and the Kennedy Center's Associate General Counsel, as well as WNO's General Director and CEO and members of WNO's Board—the Kennedy Center refused to engage substantively. It would not state what amount of WNO's financial assets it intended to return; would not discuss WNO's estimates; and would not confirm that any accounting or reconciliation would follow the 2024 Agreement. It said only that it would engage a third-party accounting firm to prepare an accounting, that its figures would be "different" from WNO's, and that the Kennedy Center did not know when WNO could review it.

79.     At the February 3 meeting, the Kennedy Center's Ms. Arduin continued to take the position that the Kennedy Center could keep or use portions of WNO's funds for the Kennedy Center's own purposes.

80.     Throughout the month of February, WNO continued to press for the promised accounting, but the Kennedy Center provided no accounting, no timeline, and no indication whether it intended to return some, all, or none of WNO's financial assets.

81.     In mid-March, the Kennedy Center's Board voted to install Mr. Floca as its new COO and Executive Director. Hoping the leadership change might create a path forward, WNO

continued its efforts to engage with the Kennedy Center. WNO reached out to Mr. Floca three times, noting the lack of progress and the mounting disruption caused to WNO's operations. But those efforts led nowhere. In late March, WNO renewed its request that the Kennedy Center return WNO's financial assets and provide an accounting, but again received no substantive response.

82.    By April 1, 2026, after nearly three months of unsuccessful, one-sided efforts to address the return of WNO's financial assets, WNO sent a formal notice of mediation pursuant to § 13.2 of the 2024 Agreement. The letter reiterated WNO's demand for the return of its financial assets and its request for an accounting according to the terms of that Agreement. WNO further requested that the Kennedy Center confirm within seven days—by April 8—that it would participate in a prompt mediation, and proposed scheduling a call to select a mediator within fifteen business days—by April 22—as required by § 13.2(a) of the 2024 Agreement.

83.    The Kennedy Center responded the next day, asking that the parties continue discussions because it was now prepared to engage with WNO. WNO agreed to an April 7 meeting as another good-faith effort to resolve the dispute expeditiously. But the meeting—attended by senior executives from both parties, WNO's Board President, the Kennedy Center's in-house and outside counsel, and representatives from the Kennedy Center's accounting firm (identified at that time as BDO)—produced no meaningful progress. The Kennedy Center still would not say whether BDO's accounting would follow the defined terms and procedures of the 2024 Agreement or when that accounting would be completed.

84.    Two days later, WNO followed up in writing. It requested another meeting on April 20 and, as a further show of good faith, agreed to extend the parties' deadline to select a mediator from April 22 to May 6. WNO also asked the Kennedy Center to state its position on the return of WNO's money and confirm that BDO's accounting would follow the 2024 Agreement. But at the

April 20 meeting with Ms. Arduin and the Kennedy Center's Associate General Counsel, WNO received no answers regarding WNO financial assets. The Kennedy Center said only that BDO had not yet completed its accounting.

85.    As the May 6 mediator-selection deadline approached, and after the Kennedy Center cancelled a meeting scheduled to occur between WNO's General Director and Mr. Floca, WNO provided the Kennedy Center a list of proposed mediators on May 4 and requested the Kennedy Center's list by the deadline. The Kennedy Center never responded.

86.    The Kennedy Center continued to delay the promised BDO meeting, including by abruptly canceling a May 11 meeting approximately 20 minutes before it was scheduled to begin—while WNO's representatives were waiting in the Kennedy Center lobby. The parties—represented by outside counsel—finally met with BDO on May 13, but that meeting did not advance resolution of the matter either. The Kennedy Center still did not provide a complete accounting as required by the 2024 Agreement or say what amount of WNO's financial assets, if any, it intended to return. Instead, the Kennedy Center said only that it would follow up the next day with a timeframe for making its position known. It never did. Nor has the Kennedy Center responded to WNO's request to engage in the process of selecting mediators pursuant to the 2024 Agreement.

87.    WNO's months-long efforts satisfied any pre-suit dispute resolution requirements under the Agreement. Any meeting among the chairs of the boards of WNO and the Kennedy Center was rendered (i) impracticable given the appointment of the President of the United States as the Chair of the Kennedy Center Board and (ii) unnecessary given the Kennedy Center's delegation of negotiating authority to its General Counsel and Chief Financial Officer.

## COUNT I – BREACH OF CONTRACT

88.    WNO incorporates by reference the preceding paragraphs in this Complaint.

89.     At all relevant times, WNO was a party to a valid and enforceable contract with the Kennedy Center. *See* **Exhibit A**, 2024 Agreement, § 14.1(b).

90.     At all relevant times, WNO performed its obligations under the 2024 Agreement.

91.     The 2024 Agreement provides that donations made to the Kennedy Center "for the benefit of WNO" must be accounted for and credited solely to the WNO Financial Accounts. *See* § 6.2. It further requires amounts recorded to the WNO Financial Accounts to be used exclusively for WNO's benefit and prohibits the Kennedy Center from subsidizing non-WNO operations out of those amounts. *See* § 8.3.

92.     The 2024 Agreement also defines and governs the principal categories of WNO funds maintained by the Kennedy Center, including the WNO Endowment Fund, the WNO BSRF, and the WNO FFIE. *See* §§ 6.3–6.6. These funds are maintained for WNO's benefit and reflected in the WNO Financial Accounts. *See* §§ 7.1–7.2, 8.4.

93.     Upon termination, the 2024 Agreement requires all WNO Assets—including assets transferred to the Kennedy Center, assets acquired and recorded in the WNO Financial Accounts during the term of the affiliation, and assets otherwise maintained by the Kennedy Center on WNO's behalf—to be delivered to WNO "as of, or promptly after," the termination date. § 12.2.

94.     The Kennedy Center breached these provisions by failing to return WNO's financial assets following termination, including funds held in or attributable to the WNO Endowment Fund, the WNO BSRF, the WNO FFIE, and other earned and contributed income and assets reflected in, or required to be credited to, the WNO Financial Accounts.

95.     As a result of the Kennedy Center's breach, WNO has been damaged in an amount WNO estimates to be at least $17,101,186.

**PRAYER FOR RELIEF**

WHEREFORE, WNO respectfully requests that the Court enter judgment in its favor and against the United States, and award WNO the relief set forth below:

a. Award WNO damages for the Kennedy Center's breaches of contract in an amount equal to the value of WNO's financial assets wrongfully withheld by the Kennedy Center, which WNO estimates to be at least $17,101,186;

b. Order, as incident of and collateral to the Court's monetary judgment, a complete accounting sufficient to determine the amounts due to WNO under the 2024 Agreement, including without limitation the Kennedy Center's accounting for Fiscal Years 2025 and 2026; the current balances of all WNO financial assets held, maintained, or controlled by the Kennedy Center; and all balances, ledger entries, earnings, revenues, contributions, expenditures, and other transactions relating to the WNO Financial Accounts, the WNO Endowment Fund, the WNO BSRF, and the WNO FFIE, and any other funds, gifts, bequests, or income received, held, or maintained by the Kennedy Center for WNO's benefit; and, with regard to all of the foregoing, whether already recorded by the Kennedy Center or required to have been recorded or credited under the 2024 Agreement;

c. Award WNO pre-judgment interest, post-judgment interest, and attorney's fees, to the extent permitted by law and/or contract;

d. Award WNO its costs; and

e. Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

By    /s/ *Daniel A. Cantor*

Daniel A. Cantor (D.C. Bar No. 457-115)
Ian S. Hoffman (*pro hac vice* forthcoming)
Hannah M. Beiderwieden (*pro hac vice* forthcoming)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Telephone: +1 202.942.5000
Fax: +1 202.942.5999
Daniel.Cantor@arnoldporter.com
Ian.Hoffman@arnoldporter.com
Hannah.Beiderwieden@arnoldporter.com

*Attorneys for Plaintiff*

Dated:  June 11, 2026

-28-